## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| MIA SOUTHWICK, | ) | |
|     Plaintiff, | ) | |
| | ) | NO. 2:05cv0050 |
| v. | ) | JUDGE HAYNES |
| | ) | |
| RUSSELL STOVER CANDIES, | ) | |
| INC., | ) | |
|     Defendant. | ) | |

## M E M O R A N D U M

Plaintiff, Mia Southwick, filed this pro se action under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e-2(a)(1), ("Title VII"), and The Family and Medical Leave Act, 29

U.S.C. § 2601 et. seq. ("FMLA"), against the Defendant, Russell Stover Candies, Inc. ("Russell

Stover"), her former employer. Plaintiff asserts claims that the Defendant discriminated against

her based on race, sex, religion, national origin and pregnancy. Plaintiff's specific allegations are

that: (1) Defendant forced Plaintiff to take two and a half weeks of FMLA leave upon

notification of Plaintiff's pregnancy; (2) Defendant assigned her to another job within the factory

that violated her doctor-imposed weight-lifting restriction in retaliation for filing a complaint

with the Equal Employment Opportunity Commission ("EEOC"); (3) Defendant created and/or

allowed a hostile work environment; (4) that Defendant treated her differently during her

pregnancy than it treated pregnant white women; (5) that Defendant terminated her employment

in retaliation for filing an EEOC complaint. The Defendant filed an answer denying Plaintiff's

allegations and the parties proceeded with discovery.

Before the Court is Defendant's motion for summary judgment, (Docket Entry No. 42),

contending in sum: (1) that Plaintiff has not asserted a viable claim under the FMLA; (2) that

Defendant did not engage in pregnancy discrimination against Plaintiff; (3) that Plaintiff was not exposed to a hostile work environment; and, (4) that Plaintiff was not terminated in retaliation for filing an EEOC charge of discrimination.

In response, (Docket Entry No. 61), Plaintiff asserts: (1) that Defendant did not honor her doctor-imposed lifting restriction; (2) that the testimony of Ann Noporat Wudhapitak supports Plaintiff's claims; and (3) that a letter dated April 14, 2004 put Defendant on notice that Plaintiff's weight restriction was not being honored and that Plaintiff was not relieved every hour as her medical condition required.

For the reasons set forth below, the Court concludes that Plaintiff has not established the necessary elements to support a claim for violation of the Family and Medical Leave Act. In addition, the Court concludes that the Plaintiff cannot support a claim for a violation of the Pregnancy Discrimination Act. However, the Court concludes that Plaintiff has established a prima facie case of hostile work environment and presented a genuine issue of material fact regarding whether Defendant retaliated against her for filing an EEOC complaint.

## A. REVIEW OF THE RECORD[1]

Southwick, who is Vietnamese, came to the United States in late 1979 and has resided in Cookeville, Tennessee since approximately 2000. (Docket Entry No. 46, Southwick Deposition

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986), app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52, (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Because there are material factual disputes for Plaintiff's hostile work environment and retaliation claims, this section does not constitute findings of fact under Fed. R. Civ. P. 56(d).

2

at pp. 6, 8).  On May 3, 2002, Southwick began her employment as a classified utility worker at Russell Stover's Cookeville facility.  (Docket Entry No. 48-1, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶¶ 1, 4).  Classified utility employees may be assigned to a general department, and based on daily production demand, may be required to work in another area of the facility.  (Docket Entry No. 52, Affidavit of Diana Meyrand, VP of Human Resources, at ¶ 2).

During her employment at Russell Stover, a collective bargaining agreement ("CBA") was in place, allowing the Bakery, Confectionary, Tobacco Workers' and Grain Millers International Workers' Union ("Union") to negotiate on behalf of all workers, regardless of union membership.  (Docket Entry No. 46 at p. 24).  This CBA governed Plaintiff's job descriptions and duties.  (Docket Entry No. 48-1 at ¶ 2).  Under the CBA, an employee is required to have the physical ability to perform his/her assigned job.  Id. at ¶ 3.

As of November 4, 2003, Southwick was assigned to work as a "Sapal Line ASA, Process Operator C" after a successful bid under the CBA. (Docket Entry No. 48-1 at ¶ 7).  According to Russell Stover, an ASA feeder on the sapal line:

> 1. Operates machinery and equipment in a safe and proficient manner, according to S.O.P.'s guidelines, standards and instructions.  Requests, receives, secures and maintains product to ensure proper placement of candy, cups, and/or trays onto sapal line.  Requires knowledge of the candy to ensure that product specifications are met.
>
> 2. Requires long periods of standing.  Requires bending, lifting, and stooping.  Must be able to climb steps.
>
> 3. Performs clean-up activities as assigned.  Conforms to rules.  May be assigned additional duties by proper supervision.

(Docket Entry No. 46-8, Southwick Deposition, Exhibit 2, Job Description).  ASA feeder on the

3

sapal line is a physical job that requires an employee to be capable of pushing/pulling 250 pounds; standing and/or walking for long periods of time; lifting; repetitive use of the arms, hands, shoulders and/or upper body; and bending and/or stooping, etc. Id. Southwick became unhappy with this position and sought to be removed from the sapal line, but Russell Stover required her to remain in that position until another employee could replace her. (Docket Entry No. 46 at p. 29).

In November 2003, after disqualifying herself from her sapal line assignment, Southwick learned she was pregnant. Id. at pp. 28, 30-1. When Southwick first saw Dr. Laura Connelly regarding her pregnancy, the doctor placed her on a 20 pound lifting restriction. Id. at p. 28. On November 10, 2003, Southwick gave Russell Stover a note from Dr. Connelly providing:

> Pt. is currently pregnant. She can not lift anything over 20 pounds and may need to take breaks as needed. If you have any questions please call... She may need to change to a job that will be easier for...her...

(Docket Entry No. 46-9, Southwick Deposition, Exhibit 13, Doctor's Note).

Southwick could not meet the requirements of her work description as an ASA feeder with a 20 pound lifting restriction. See (Docket Entry No. 46-8, Exhibit 2). As a result, Susan Beasley, the human resources manager, sent Southwick home for two and one half weeks of FMLA leave until a position within Southwick's lifting restriction became available. (Docket Entry No. 46 at pp. 27-8). Southwick received a letter dated November 11, 2003 from Beasley stating that she was approved for the intermittent FMLA leave she requested, beginning on November 4, 2003. (Docket Entry No. 45-6, Leave of Absence Approval, p. 18). According to a memorandum in Southwick's employment file, November 26, 2003 was listed as Southwick's return-to-work date. (Docket Entry No. 45-6, Memorandum, p. 27).

4

Due to various doctor appointments for her pregnancy, Southwick accumulated additional hours against her FMLA leave. (Docket Entry No. 45-6). According to a leave of absence intake form, Russell Stover contends that as of May 11, 2004, Southwick had already used three weeks, three days and five hours of FMLA leave in the preceding 12 months. (Docket Entry No. 45-6, Leave of Absence Intake Form, p. 51).

After the two and one half weeks of FMLA leave, Southwick returned to work as a utility employee in choco-pak, a work area within the enrobing department. (Docket Entry No. 46 at p. 30 and Docket Entry No. 52 at ¶4). Southwick was assigned to tray wash, part of the enrobing department that required her to stack trays as part of her job. (Docket Entry No. 46 at pp. 33-4). A fellow employee informed Southwick that an entire stack of trays weighs 30 pounds, though Southwick concedes that she was never actually required to lift an entire stack of trays at one time. Id. Fay Huddleston, Southwick's lead[2] in tray wash, told Southwick that she could break up the trays into smaller stacks to remain within the confines of her doctor's weight restriction. Id. at p. 35. Southwick describes her tray wash duties as follows:

> I had to move the skids with four trays. You have to move it with a pallet jack, and pushing and pulling. That is very heavy. That is well over 300 pounds, in my estimated guess. And I have to get the skids. The skids are way over 20 pounds, and it is wooden skids. I have to lift off, they are stacked up. And in order to lift that, to move to the area, that is way over 20 pounds. I was doing that all day long.

Id. Southwick asserts that the tray wash position in choco-pak violated her 20 pound weight restriction. Id. at p. 36.

Southwick filed her first EEOC charge on May 19, 2004 alleging discrimination. (Id. at

---

[2] Southwick describes the lead to be her "boss", but admits that a lead is not a supervisor. (Docket Entry No. 46 at p. 35).

5

pp. 56-7 and Docket Entry No 46-8, Exhibit 6). In her EEOC complaint, Southwick alleged that Russell Stover allowed other employees to work under medical restrictions while she was forced to take leave upon submitting a work restriction. (Docket Entry No. 46 at pp. 57-8). Although Southwick voluntarily disqualified herself from her sapal line assignment, Southwick contends that Russell Stover retaliated against her for filing her first EEOC complaint when it assigned her to tray wash immediately following her two and one half week FMLA leave and alleges that the involuntary FMLA leave itself violates the FMLA. (Id. at pp. 50-52 and Docket Entry No. 27-2, Amended Complaint). For her claim that Russell Stover retaliated her against in November 2003 for filing an EEOC complaint in March 2004 Southwick admits that she did not tell anyone at Russell Stover that she planned to file an EEOC complaint. Id. at pp. 57, 64.

On January 26, 2004, Southwick complained to Beasley that her assignment in tray wash violated her weight restriction. (Docket Entry No. 45-1, Affidavit of Susan Beasley at ¶ 6). The next day, Beasley removed Southwick from tray wash and reassigned her to a different position within choco-pak. Id. Southwick's new position involved "standing and getting candy off the line and pushing and pulling the canisters." Id. at p. 37. Southwick admits that this job did not violate her weight restrictions, but insists that:

> ... there is still the trays have to be fed so that the candy will come out on the tray. And there is no way that you can pick up one tray at a time, because speed, I mean you have to help your other partner to work too. You just can't be selfish and pick up one tray at a time. You have got to pick up big stacks to put in the trays so that the candy can come off on the trays.

Id.

Southwick also asserts that her co-workers subjected her to inappropriate comments and harassed her in the workplace. Before her assignment to choco-pak, Southwick endured

6

harassment from a group of hourly employees. Id. at p. 70. Southwick reported this harassment to Charlotte Boles, her lead at the time. Id. at 71. Boles offered to hold a line meeting to resolve the harassment issues, but Southwick declined because she "didn't want to be like a crybaby and make the situation worse." Id. at 72. Southwick acknowledges that Russell Stover posted its Harassment/Discrimination, Equal Employment Opportunity and Sexual Harassment policies as well as the Affirmative Action Plan. Id. at pp. 46-8. These policies prohibit discrimination and sexual harassment as well as promote diversity in the workplace. See (Docket Entry No. 46-8, Exhibit 3, Discrimination/Harassment Policy, Exhibit 4, EEO Policy and Affirmative Action Plan, and Exhibit 5, Sexual Harassment Policy). In addition, these polices direct the employee to bring his/her complaints or concerns directly to Beasley or one of three named corporate officials. Id.

In her first EEOC charge, Southwick alleged discrimination based on sex, religion and national origin. (Docket Entry No. 46-8, Exhibit 6). For these claims, Southwick identifies the following incidents of discrimination: (1) that Russell Stover forced her on FMLA leave due to her weight restriction when Russell Stover transferred a pregnant white woman with weight restrictions to a job without any lifting requirements; (2) that she harassed based on national origin because her vehicle was scratched by unknown persons and that she was subjected to anti-Asian comments such as "coming off the boat," "talking funny" and that "all Orientals look alike"; (3) that co-workers commented that "it is not normal to have two religions" (Southwick is Catholic and Buddhist) and "what type of religion would worship a statue?"; and (4) that a co-worker questioned whether her genitals are slanted. Id. Southwick also cites incidents involving Ann Wudhapitak, an Asian employee of Defendant. In her EEOC complaint, Southwick

7

contends that employees threw candy at Wudhapitak.[3]  (Docket Entry No. 46 at pp. 98-100).

Further, Southwick overheard someone tell  Wudhapitak that she "stunk like garlic".  Id. at p. 99.

Southwick also overheard fellow employees comment to Wudhapitak that Asians have a "funny

language," but Southwick did not relay this complaint to Beasley.  Id. at p. 100.  Donna

Hackenburg, Southwick's co-worker told her that "all orientals look alike," but Southwick did

not inform Beasley when this incident occurred.  Id. at p. 103.  Southwick lists several other

instances involving Wudhapitak on her first EEOC complaint.  Id. at pp. 108-9.

> After her vehicle had been scratched, Southwick complained about the harassment to

Beasley.  (Docket Entry No. 46 at p. 73).  According to Beasley:

> Despite my inquiries, she would not provide me with specific instances of
> misconduct or persons who were harassing her or otherwise creating a hostile
> work environment.  At the end of our meeting, she informed me that she did not
> want to pursue the inquiry further.  Although she indicated no desire for the
> Company to pursue her concerns, I undertook an initial investigation by speaking
> with her Supervisor and Lead in an attempt to ascertain any credibility or validity
> of the issues expressed... Upon conclusion of my initial investigation, I
> communicated my findings with human resource officials at the Company office
> in Kansas City.

(Docket Entry No. 45-1, Beasley Affidavit at ¶ 7).  Southwick subsequently met with Diana

Meyrand, Russell Stover's Assistant Vice President of Human Resources, on January 6, 2004

regarding her complaints.  Id. at ¶ 8.  In this meeting, Southwick expressed concerns that "people

were saying things about [her] race."  (Docket Entry No. 44-2, Confidential Memorandum).

Southwick did not give Meyrand the names of any of the harassing employees who worked at

Russell Stover at the time, she only supplied the names of persons no longer employed with the

---

[3]  Although in her deposition Southwick claims that employees threw candy at her as
well, she did not include that information in her EEOC charge.  Id. at p. 99.

company. Id. Southwick explained that she did not provide Meyrand with the names of current, harassing co-workers because she feared termination. (Docket Entry No. 46 at p. 187). During the meeting, Southwick did name Linda Ledbetter, as a pregnant woman working in choco-pak who also had a weight restriction and was not required to take leave. Id. After that meeting, Meyrand investigated Southwick's harassment claim and concluded that evidence was insufficient to justify further action. (Docket Entry No. 45-1at ¶ 8).

As to her pregnancy discrimination claim, Southwick's weight restriction was the only doctor ordered limitation, but contends Russell Stover could have made work conditions easier during her pregnancy. (Docket Entry No. 46 at pp. 52-3, 61-2). According to a Dr. Laura Connelly, Southwick's treating physician, Southwick was to be on maternity leave from March 17, 2004 until October 4, 2004. (Docket Entry No. 46-9, Exhibit 10, Medical Certificate).

Russell Stover approved Southwick's FMLA block leave as of May 17, 2004 in a letter dated May 18, 2004. (Docket Entry No. 45-6, Approval Block Leave, p. 50). This document contained the following instructions:

> 1. You will be required to notify us of the date of birth and provide documentation of the same.
>
> 2. You will be required to provide a medical update report every 30 calendar days. The first medical update is due on 06-16-04.
>
> 3. To return to work, you will be required to submit a physician's statement indicating you are able to return without limitations (you are able to perform you essential, normal job duties). Should you sustain permanent medical impairments, consideration of reasonable accommodation under the Americans with Disabilities Act may be applicable.
>
> 4. You must notify us at least two (2) working days prior to the date you intend to return to work. Failure to comply will delay your being placed on the work schedule.

9

> 5. If you are unable to return to work at the conclusion of your approved date, you will need to request an extension of your FMLA leave, if applicable. You must contact me within two (2) working days of the date of leave expiration. You will be required to provide medical documentation to support your leave request.

Id. (emphasis supplied).

In a letter dated July 13, 2004, Beasley informed Southwick that her twelve week FMLA leave would expire on July 27, 2004. (Docket Entry No. 46-9, Exhibit 18, End of Leave Letter). This letter further stated that Southwick could request additional leave with documentation to be returned to the personnel office no later than close of business on July 29, 2004. Id. On July 21, 2004, Beasley wrote another letter to Southwick explaining that the medical update Russell Stover received from Southwick on July 16, 2004 was incomplete and her medical leave request was "pending" additional information. Id. at Exhibit 19. According to the letter: "[a]ny additional information you wish us to consider must be received no later than 07-27-04. You are due to return on 07-28-04. Any absences or tardiness incurred will fall under our No Fault Attendance Policy, which may result in separation of employment." Id. Southwick did not supplement the medical packet and contends she could not have done so because Dr. Connelly's office was closed during that time. (Docket Entry No. 46 at p. 220).

On August 5, 2004, Southwick received her tenth absence in a six month period which is cause for termination under Russell Stover's No Fault Attendance Policy. (Docket Entry No. 45-1 at ¶¶ 11-12). In a letter dated August 5, 2004, Beasley cited failure to return to work as the reason for Southwick's termination. (Docket Entry 46-9, Exhibit 16, Separation Letter). The letter states:

> On 07-27-04, your leave under the Family and Medical Leave Act expired. Since you have exhausted the time available, your rights as specified will no longer be applicable.

10

> Failure to request an extension and provide verifying documents as agreed in the
> original request for leave, and your failure to work on 07-28-04 has resulted in
> separation of employment with Russell Stover Candies effective 08-04-04.

Id. Additionally, in a separation notice from the Tennessee Department of Labor, failure to

return from leave is cited as the reason for Southwick's termination. Id. at Exhibit 17.

According to Dr. Connelly, Southwick she was not to return to work until October 4, 2004.

(Docket Entry No. 46 at p. 164). Southwick acknowledges that her FMLA leave had exhausted

before her termination in August 2004. (Docket Entry No. 46 at p. 28). Southwick further

concedes that she would not have returned to work on August 4, 2004 even if Russell Stover

denied her request for extended leave. Id. at p. 214. In fact, Southwick states that she would not

return to work under any circumstances before September 1, 2004 because of her child's age. Id.

at 215.

Southwick filed a second EEOC complaint dated March 17, 2005. (Docket Entry No. 46-

8, Exhibit 8, EEOC Charge). In this charge, Southwick alleges that Russell Stover terminated

her in August 2004 in retaliation for filing her first EEOC complaint in March 2004. Id. The

document further states that at the time of her termination, Southwick was on FMLA leave and

believes Russell Stover treated her unfairly. Id.


### B. CONCLUSIONS OF LAW

"The very reason of the summary judgment procedure is to pierce the pleadings and to

assess the proof in order to see whether there is a genuine need for trial." Advisory Committee

Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover,

"district courts are widely acknowledged to possess the power to enter summary judgment sua

11

sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data

12

Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrating the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

13

The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No.

89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment

must determine 'whether the evidence presents a sufficient disagreement to require a submission

to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting

Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material

factual dispute is genuine, applying the governing law.

More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

* * *

Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

14

It is likewise true that:

> [I]n ruling on a motion for summary judgment, the court must construe the
> evidence in its most favorable light in favor of the party opposing the motion and
> against the movant. Further, the papers supporting the movant are closely
> scrutinized, whereas the opponent's are indulgently treated. It has been stated that:
> 'The purpose of the hearing on the motion for such a judgment is not to resolve
> factual issues. It is to determine whether there is any genuine issue of material
> fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must

be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Company,

791 F.2d. 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a

summary judgment motion:

> A district court is not required to speculate on which portion of the record the
> nonmoving party relies, nor is it obligated to wade through and search the entire
> record for some specific facts that might support the nonmoving party's claim. Rule
> 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient
> to establishing a genuine issue of material fact for trial. This marshalling of
> evidence, however, does not require the nonmoving party to "designate" facts by
> citing specific page numbers. Designate means simply "to point out the location of."
> Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with
> enough specificity that the district court can readily identify the facts upon which the
> nonmoving party relies; but that need for specificity must be balanced against a
> party's need to be fairly apprised of how much specificity the district court requires.
> This notice can be adequately accomplished through a local court rule or a pretrial
> order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some

references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of

undisputed and disputed facts.

15

In <u>Street</u>, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1.  Complex cases are not necessarily inappropriate for summary judgment.

2.  Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.  The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.  A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.  As on federal directed verdict motions, the `scintilla rule' applies, <u>i.e.,</u> the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.  The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.  The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.  The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.  The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine

16

whether the respondent's claim is 'implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

It is sometimes difficult to interpret the contentions of a pro se litigant. "While a court must construe a pro se plaintiff's pleadings more liberally than pleadings prepared by an attorney, pro se litigants 'are not exempted or excused from the Federal Rules governing pleading, dismissal for failure to state claims, and summary judgment.'" Moore v. Holbrook, 2 F.3d 697, 705 (6th Cir.1993). See also McKinnie v. Roadway Express, Inc., 341 F.3d 554, 558 (6th Cir.2003) ("Ordinary civil litigants proceeding pro se, however, are not entitled to special treatment, including assistance in regards to responding to [dispositive] motions."). In an abundance of caution, the Court will discuss the claims it believes the Plaintiff has raised given a liberal reading of her pleadings.

## FMLA

As to the Plaintiff's FMLA claim, her original and amended complaints (Docket Entry Nos. 1 and 27-2 at p.6, respectively), Plaintiff lists the forced two and one half weeks leave under Section 8(d) "Retaliated against plaintiff for having filed a charge of discrimination." Yet, in her deposition, the Plaintiff states she is not alleging any retaliation or discrimination claims under

17

the FMLA, and that her only FMLA claim is for the two and one half weeks of forced FMLA leave. See (Docket Entry No. 46 at pp. 40-2). Thus, the Court is interpreting this claim to be an alleged interference with Plaintiff's rights under the FMLA.

To establish a claim under the FMLA, the Plaintiff must show: (1) that she is an eligible employee under the FMLA; (2) that the Defendant is an employer under the FMLA; (3) that she is entitled to leave under the FMLA; and (4) that the Defendant engaged in a prohibited act as defined in 29 U.S.C. § 2615. See Spurlock v. NYNEX, 949 F.Supp.1022 (W.D.N.Y.1996). The dispute amongst the parties arises only in regard to the fourth prong of the prima facie FMLA claim.

The Family and Medical Leave Act, 29 U.S.C. § 2601 et. seq. is designed, in part, to counterbalance inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods. Under the FMLA, employers must make leave available for employees who present eligible medical reasons. "[A]n eligible employee shall be entitled to a total of 12 workweeks of leave during any 12 month period for...a serious health condition that makes the employee unable to perform the functions of the position of such an employee." 29 U.S.C. § 2612(a)(1)(D) (2005). The FMLA defines "serious health condition" as an "illness, injury, impairment or physical or mental condition that involves...continuing treatment by a health care provider." 29 U.S.C. § 2611 (11)(B) (2005) .

The FMLA prohibits an employer from interfering with an employee's rights granted under the act. Under 29 U.S.C. § 2615(a)(1), it is unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the FMLA. The relevant inquiry becomes whether Russell Stover interfered with Southwick's exercise or

18

attempt to exercise her rights set forth in the FMLA when it forced her to take two and one half

weeks FMLA leave upon learning of her pregnancy and lifting restriction.

Employers are permitted to place an employee on FMLA leave when that employee

suffers from a "serious medical condition". <u>Wysong v. Dow Chemical Co.</u>, No. C2-04-CV-07,

2005 WL 1972550 (S.D. Ohio Aug.12, 2005). The Secretary of Labor defined "serious health

condition" as follows:

> (a) For the purposes of FMLA, "serious health condition" entitling an employee to
> FMLA leave means an illness, injury, impairment, or physical or mental condition
> that involves:
> (2) Continuing treatment by a health care provider.
> A serious health condition involving continuing treatment by a health care
> provider includes any one or more of the following:
> (ii) Any period of incapacity due to pregnancy, or for prenatal care.
> (A) Requires periodic visits for treatment by a health care provider, or by a nurse
> or physician's assistant under direct supervision of a health care provider;

29 C.F.R. § 825.114.[4] A period of incapacity includes "inability to work, attend school or

perform other regular daily activities due to the serious health condition, treatment therefor, or

recovery therefrom." 29 C.F.R. § 825.114(a)(2)(i).

According to the record, Southwick requested and received both intermittent and block

FMLA leave regarding her pregnancy. Thus, there can be no dispute as to whether Southwick's

condition could be classified as a "serious health condition." Further, it is undisputed that

Southwick could not push or pull 250 pounds during her pregnancy and thus could not perform

the duties required of her as an ASA feeder on the sapal line. The only question that remains, is

whether an employer can place an eligible employee on involuntary FMLA leave.

_____

[4] The Secretary of Labor has the authority to promulgate regulations to implement the
FMLA. 29 U.S.C. § 2654.

Some courts have concluded that an employer may place an eligible employee on involuntary FMLA leave.

> Admittedly, many FMLA cases involve an employee *asking for* FMLA leave. However, there is nothing in the statute or jurisprudence which prevents an employer from placing an employee on unpaid leave. Two unreported district court cases are relevant to the issues presented in this case. In <u>Love v. City of Dallas</u>, 1997 WL 278126, *6 (N.D.Tex.1997) (not reported)... the court said:...Plaintiffs also misinterpret and attempt to misuse the statute. Plaintiffs state that "[n]othing in the text of the FMLA or the [Department of Labor] regulations allows an employer...to involuntarily put an employee on unpaid family leave." However, and more relevantly, nothing in the statute prohibits an employer from doing so * * * Employers who force employees to take unpaid leave under the FMLA and are really only: (1) placing the employee on involuntary leave, and then (2) giving the employee the option of availing him or herself the benefits of the FMLA during the first twelve weeks of the leave...

> In <u>Harvender v. Norton Company</u>, 1997 WL 793085, *6 (N.D.N.Y.1997) (not reported), the Court reached a similar conclusion, finding that a plaintiff has "no right under the FMLA to bring action against an employer for placing an eligible employee on leave." The Court further said "nowhere in the act does it provide that FMLA leave must be granted only when the employee wishes it to be granted. On the contrary, the FMLA only provides that leave must be given when certain conditions are present."

<u>Moss v. Formosa Plastics Corp.</u>, 99 F.Supp.2d 737, 740-41 (M.D.La.2000).

Other courts have held that whether the plaintiff could work when placed on leave is immaterial. In <u>Wysong</u>, the district court rejected the plaintiff's argument that her employer violated the FMLA when it placed her on involuntary FMLA leave because she could have worked on that day. The district court stated that the relevant question in regard to involuntary leave is whether the plaintiff's suffered from a "serious health condition," not whether the plaintiff could have worked. <u>Wysong</u>, 2005 WL 1972550, *6.

Although Southwick argues that she could have been given another assignment that fell within her lifting restriction, under the CBA, her disqualification obligated her to remain on the

sapal line until Russell Stover located a replacement.  Finally, even if Southwick's pregnancy

could not be considered a "serious condition," she cannot claim to have been harmed by the two

and a half weeks of forced FMLA because she still would have been unable or unwilling to

return to work on a date two and a half weeks after Russell Stover claims her FMLA leave would

have ended.  See Roberson v. Cendant Travel Services, Inc., 252 F.Supp.2d 573

(M.D.Tenn.2002) (citing Homes v. e.spire Communications, 135 F.Supp.2d 657 (D.Md.2001)

(holding that there was no FMLA violation, despite the employer using the wrong dates for the

FMLA leave, because the employee was unable to return to work on the date the leave should

have ended)).

Thus the Court concludes that Southwick has not established a claim for relief under the

FMLA because as an eligible employee who could not perform her job duties, Russell Stover was

within its right to place her on involuntary leave and she could not return to work until

September at the earliest.

## Pregnancy Discrimination Act[5]

Title VII makes it illegal for an employer to discriminate against any individual with

respect to the employee's compensation, terms, conditions or privileges of employment, because

of such individual's sex.  42 U.S.C. § 2000e-2(a)(1).  Under the Pregnancy Discrimination Act of

1978 ("PDA"), the phrase "because of sex" in the language of Title VII was interpreted to

include "because of or on the basis of pregnancy, childbirth or related medical conditions."  42

---

[5] The Court is analyzing Plaintiff's claims relating to her pregnancy under the PDA and
the regular provisions of Title VII.  In her deposition, Plaintiff compares the treatment she
received to that of a pregnant white woman, which seems to the Court to be an issue of race
discrimination, not pregnancy.  In an abundance of caution, the Court will look at any possible
claims the Plaintiff asserted under the PDA.

21

U.S.C. § 2000e(k). The PDA further states that "women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work..." Id.

Southwick claims that after she voluntarily disqualified from her position on the sapal line, Russell Stover transferred her to a position that violated her doctor-imposed lifting restriction because she was pregnant. In McDonnell Douglas, the Supreme Court articulated a burden shifting framework used to analyze Title VII cases. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). This burden shifting framework applies with equal force to claims arising under the PDA portion of Title VII. Asher v. Riser Foods, Inc., No 92-3357, 1993 WL 94305 at *4 (6th Cir. Mar. 30, 1993). The Court interprets Southwick's claims under the PDA to be: (1) discrimination based on disparate treatment because she claims "...I could have had a job working not lifting, because there are other employees that do jobs with no lifting," (Docket Entry No. 46 at p. 44); and (2) retaliation because she was placed in a job that violated her lifting restriction after she filed her first EEOC charge Id. at 49. The Court need not discuss Southwick's second claim of retaliation because her transfer to a position in choko-pak happened in November 2003 before she filed her first EEOC complaint on March 19. 2004, and admits that she did not tell anyone of her intention to file an EEOC charge. Id. at p.57.

To establish a prima facie case of pregnancy discrimination under the PDA, Southwick must show: (1) she was a member of the protected class (pregnant); (2) she suffered an adverse employment action; (3) she was qualified for her position; and (4) she was treated differently than similarly situated individuals outside the protected class, or replaced by someone outside the

protected class. McDonnell Douglas, 411 U.S. at 802; Warfield v. Lebanon Correctional Inst., 181 F.3d 723, 728-9 (6th Cir.1999). It is undisputed that Southwick was pregnant or that she was qualified for her position. In dispute is whether Southwick's transfer to the choko-pak position in the enrobing department was an adverse employment action and whether she was treated differently than a similarly situated employee outside the protected class or replaced by someone outside the protected class.

The Sixth Circuit has defined an "adverse employment action" as follows:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alternation of job responsibilities. A materially adverse change might be indicated by termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Hollins v. Atlantic Co., Inc., 188 F.3d 652, 662 (6th Cir.1999) (citing Crady v. Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir.1993)). To establish her prima facie claim, Southwick must present sufficient evidence to show that her assignment to choko-pak that violated her weight restriction constituted an adverse employment action.

Reassignments without changes in salary, benefits, title or work hours do not ordinarily constitute adverse employment actions. Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885 (6th Cir. 1996). Yet, there can be "other indices unique to the situation that can make what is otherwise a lateral transfer or reassignment an adverse employment action." Smith v. Chrysler Financial Corp., 101 F.Supp.2d 534, 544 (E.D.Mich.2000). It is undisputed that the reason for Southwick's transfer was a voluntary disqualification that occurred before she learned of her pregnancy. However, even if she had not disqualified, Southwick could not perform the duties required of an employee on the sapal line because she could not push or pull 250 pounds. Thus,

23

it is not the transfer itself that must constitute an adverse employment action, but rather that the transfer required Southwick to perform duties that violated her lifting restriction. Even if the Court were to conclude that the transfer to choco-pak constituted an adverse employment action, Plaintiff has not presented any evidence to suggest that she has satisfied the fourth prong of the prima facie case as she has not discussed the employee who replaced her or compared her situation to that of any non-pregnant employee. Thus, Southwick does not have any claim under the Pregnancy Discrimination Act.

### Hostile Work Environment

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion sex or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can establish a violation of Title VII if he/she is able to prove that discrimination created a hostile work environment. Clark v. United Parcel Service, Inc., 400 F.3d 341, 347 (6th Cir.2005). Title VII is thus violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). Southwick claims that the conditions during the time of her employment at Russell Stover constituted a hostile work environment. According to the record, Southwick claims to have endured disparaging comments relating to her race, national origin and religion and that these comments created a hostile and abusive work environment.

In order to establish a <u>prima facie</u> case of hostile work environment[6], the Southwick must demonstrate the following: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome racial and/or religious harassment; (3) that the harassment was based on her sex, race or religion; (4) that the harassment created a hostile work environment; and (5) Russell Stover is vicariously liable.   <u>See</u> <u>Hafford v. Seidner</u>, 183 F.3d 506 (6th Cir.1999). Russell Stover concedes that Southwick is a member of a protected class as being of Vietnamese/Asian descent and a practicing Buddhist/Catholic.  <u>See</u> (Docket Entry No. 47 at p.14).

Harassment affects a "term, condition or privilege of employment" if the conduct is severe or pervasive enough to alter the conditions of the plaintiff's employment and creates an abusive working environment. <u>Harris</u>, 510 U.S. at 21-22.  For conduct to qualify as having created a hostile work environment, both an objective and subjective test must be met:

> "[M]ere utterance of an ... epithet which engenders offensive feelings in a [sic] employee," <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted) does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment– an environment that a reasonable person would find hostile or abusive– is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

<u>Harris</u>, 510 U.S. at 21-2.  To determine whether the objective and subjective tests are met, the Court must look at the totality of the circumstances.

[W]hether an environment is "hostile" or "abusive" can be determined only be

---

[6] The elements of the <u>prima facie</u> case of hostile work environment are the same, regardless of the discrimination context in which the claim arises.  <u>Hafford</u>, 183 F.3d at 512.

Case 2:05-cv-00050   Document 73-2   Filed 03/09/07   Page 25 of 34 PageID #: 785

looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance... no single factor is required.

Id. at 23.

To fulfill the second, third and fourth elements of the prima facie case, Southwick alleges that she was "verbally attacked" with comments such as "coming off the boat" and references that Asians have a "funny language" and that "all Orientals look alike." She also alleges to have been "subjected to slanderous religious comments." (Docket Entry No. 27, Amended Complaint at ¶ 9). An employee questioned Southwick why she had two religions and asked "what kind of religion worships a statue?" and informed Southwick that Buddhism is a "cult". (Docket Entry No. 46 at p. 199). Southwick admits that Buddhists do pray to statues. Id. at p. 200. Although these comments about her religion upset her, Southwick did not complain to Beasley, but did mention the comments to her lead. Id. at p. 84. Southwick claims co-workers threw candy at Wudhapitak because of her ethnicity and Southwick further asserts that employees threw candy at her as well, although it was not alleged in her complaint. Id. at p. 99. Moreover, Southwick believes that a co-worker scratched her car, though she does not know which one. Id. at p. 73. Wudhapitak, a former co-worker also of Asian descent, substantiates many of Southwick's claims. See Docket Entry No. 57-2, Deposition at pp. 36-39, 51-55.

In addition, while working on one of the lines, Southwick endured inappropriate comments of a sexual nature from three male employees and presented her complaints to Boles. Id. at p. 146. Specifically, male co-workers asked Southwick if her genitals were slanted. (Docket Entry No. 27-2 at p. 6). Southwick did not ask Boles to take any action regarding her complaint and turned down Boles's offer of a meeting. Id. at 147. She admits that she did not

26

speak with Beasley regarding these incidents. Id. at p. 195.

Further, as part of the totality of the circumstances, the Court must take into account allegations of harassment from other employees, namely Wudhapitak. Not only has Wudhapitak heard many of the derogatory comments mentioned above, but has had such comments directed toward her on a frequent basis. See (Docket Entry No. 57-2, Wudhapitak Deposition at pp. 37-39, 51-52, 54, 56-59, 62-67, 69, 88-89). In addition, Wudhapitak alleges that a lead slapped her hand while she packed candy and that her co-workers threw candy at her. Id. at pp. 69-77, 56).

Southwick also makes various contentions in her complaint that are not included in her EEOC charges. Yet, these comments were not directed toward her, rather she either Southwick overheard the comments as other employees were talking amongst themselves or does not recall if the statements were made to her directly. Id. at p. 196. Southwick believes that Hackenburg said that "orientals all look alike," but is uncertain if the statement was made to her personally. Id. According to Southwick, Hackenburg told both herself and Wudhapitak that "their [Asians] eyes are too small to have peripheral vision." Id. at p. 198. Although Southwick presents evidence that other employees were harassed, it is still relevant to prove her claim. "[A]n employer may create a hostile environment for an employee even when it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just as the plaintiff herself." Jackson v. Quantex Corp., 191 F.3d 647, 661 (1999). Also, simply hearing derogatory comments can evidence a hostile work environment. "[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment." Id. (citing Perry v. Eathan Allen, Inc., 115 F.3d 143, 151 (2d Cir.1997)).

The Court, in viewing the facts in the light most favorable to Southwick, as it must in a motion for summary judgment, has concluded that she has met the requirements for the second, third and fourth elements of her prima facie case . The instances Plaintiff mentioned were numerous and undoubtedly related to her national origin and religion.  Further, the Plaintiff stated in her deposition that she found these comments offensive and harassing.  See e.g. (Docket Entry No. 46 at pp. 195-99).  Moreover, the harassment Wudhapitak endured strengthens Southwick's position that Russell Stover was objectively hostile to Asians and that as an Asian, Southwick subjectively perceived her work environment to be hostile. See Jackson, 191 F.3d at 161.  The Court also concludes that a reasonable person could find these comments to be abusive and would be intimidated by the physical nature of some of the employees' actions.

For an employer to be vicariously liable for the harassment of its employees, the plaintiff must show that the employer "knew or should have known of the charged... harassment and failed to implement prompt and appropriate corrective action." Williams v. General Motors Corp., 187 F.3d 553, 561 (6th Cir.1999) (citing Hafford, 183 F.3d at 513).

Southwick admits that she "did not complain every statement being said, this and that. [She] did complain, but not every statement on every incident that happened." (Docket Entry No. 46 at p. 195).  When Southwick did complain to Beasley, Southwick declined the offer of action Beasley made.  "Well, she asked me if I wanted a meeting after I complained to her so many times.  I told her no, because all those workers would know it was from me, and that would have been a worse working situation." (Docket Entry No. 46 at p. 147).  Although Southwick did not present every incidence of harassment to Beasley, it is undisputed that Beasley and Meyrand as well as other Russell Stover representatives knew of Southwick's complaints.

28

According to Beasley's affidavit, " Mia Southwick approached me with concerns about workplace harassment from her co-workers on the assembly line." (Docket Entry No. 45-1 at ¶ 7). In addition, Southwick made Meyrand aware of the alleged harassment. Moreover, Wudhapitak complained at least six or seven times of harassment and inappropriate physical contact at Russell Stover. (Docket Entry No. 52-5 at p. 40). Thus, the inquiry becomes whether Russell Stover "failed to implement prompt and appropriate corrective action." <u>Williams</u>, 187 F.3d at 561.

According to Russell Stover, it should not be held vicariously liable for the alleged harassment of its employees because "Mia Southwick did not provide specific instances of misconduct or the names of persons who she believed were harassing her, and because she indicated to Susan Beasley that she [did] not want to pursue the inquiry further" (Docket Entry 44-1 at ¶2), and because Russell Stover undertook an investigation in January of 2004 that yielded insufficient evidence of harassment. Yet, an investigation is may not be enough to cease hostile and harassing behavior.

> "[A] plaintiff may hold an employer directly liable if she can show that the [employer's]...response manifested indifference or unreasonableness. <u>See</u> <u>Blankenship v. Parke Care Ctrs.</u>, 123 F.3d 868, 873 (6th Cir.1997) (citing <u>Pierce</u> <u>v. Commonwealth Life Ins. Co.</u>, 40 F.3d 796, 805 (6th Cir.1994)). Significantly, a court must judge the appropriateness of a response by the frequency of the severity of the alleged harassment. <u>See</u> <u>Erebia v. Chrysler Plastic Prods. Corp.</u>, 772 F.2d 1250, 1252-53 (6th Cir.1985). Generally, a response is adequate if it is reasonably calculated to end the harassment." <u>See</u> <u>Intlekofer v. Turnage</u>, 973 F.2d 773m 778 (9th Cir.1992) (citing <u>Katz v. Dole</u>, 709 F.2d 251, 256 (4th Cir.1983)).

<u>Jackson</u>, 191 F.3d at 663. An investigation, without more, does not seem to the Court to be an response intended to end the alleged harassment, rather a method to verify or validate Southwick's complaints. In fact, after the investigation, no action was taken. This investigation

29

may seem to be an inadequate response to a jury given the fact that Southwick had complained to Beasley about perceived harassment based on national origin on May 14, 2003 nearly nine months prior the investigation. (Docket Entry No. 45, Exhibit C, Beasley Meeting Notes). In addition, during the investigation, Meyrand spoke with Wudhapitak who revealed that she felt that she was treated differently than American employees, asked by a co-worker whether she could see side to side due to the shape of her eyes, and asked whether she could speak English. (Docket Entry No. 45-4 at pp. 4-5). Moreover, during the investigation, Hackenburg, one of the alleged harassing employees confirmed that Wuhapitak felt that she was discriminated against because of her race. Id. at p. 8. Put differently, because the investigation yielded information that substantiates Southwick's allegations, it could reasonably be concluded that the situation warranted further action.

Because no affirmative actions were taken, nothing was done to prevent future harassment. Thus, the Court finds that a reasonable jury could conclude that Russell Stover's investigation to be an inadequate response to the allegations of harassment and thus be liable for the harassment of its employees.

### Discrimination Based on National Origin

Title VII makes it illegal for an employer to discriminate against any individual with respect to the employee's compensation, terms, conditions or privileges of employment, because of such individual's national origin. 42 U.S.C. § 2000e-2(a)(1). The language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment..." Harrus v Forklift Systems, Inc., 510 U.S. 17,

30

20 (1993) (citing <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d

49 (1986)).  Southwick claims that during her pregnancy, Russell Stover treated her differently

than it had treated pregnant white women, and that she was treated differently because of her

national origin.

> "A <u>prima facie</u> case of disparate treatment under Title VII must establish by a
> preponderance of the evidence that the defendant took action affecting the
> plaintiff's compensation, terms, conditions or privileges of employment under
> circumstances which give rise to an inference of unlawful discrimination... Thus,
> the <u>prima facie</u> case focuses upon the primary factual inquiries of any disparate
> treatment case: "'[whether] the defendant intentionally discriminated against
> plaintiff'", and whether the employer treats people less favorably than others
> because of race, color, religion, sex or national origin.

<u>Beaven v. Com. of Ky.</u>, 783 F.2d 672, 675-76 (6th Cir.1986) (internal citations omitted).

A plaintiff may create a presumption of discrimination when she establishes the following

elements by a preponderance of the evidence: (1) membership in a protected class; (2) that she

suffered from an adverse action; (3) that she was qualified for the position; and (4) that she was

treated differently from similarly situated members of the unprotected class.  <u>Alexander v. Local</u>

<u>496, Laborers' Intern. Union of North America</u>, 177 F.3d 394, 402-03 (6th Cir.1999) (citing

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)).  As stated earlier, Russell Stover does

not dispute that Southwick was a member of a protected class (Asian) or that she was qualified

for her position.  In dispute is whether Southwick suffered from an adverse employment action

and whether she was treated differently from similarly situated members of the unprotected class.

To establish an adverse employment action, Southwick asserts that Russell Stover forced

her to take FMLA leave upon notification of her pregnancy when she could have been assigned a

task that did not violate her lifting restrictions.  The Sixth Circuit has held that forcing an

employee on leave can constitute an adverse employment action in the context.  <u>Tysinger v.</u>

31

Police Dept. of City of Zanesville, 463 F.3d 569, 573 (6th Cir.2006) ("the district court correctly determined, for purposes of summary judgment analysis, that defendant, by denying Tysinger accommodating work within her restrictions and requiring her to take an extended leave of absence, partly without pay, subjected her to an adverse employment decision.").

Russell Stover contends that it imposed leave because Southwick could not perform the functions required of her job description and there was no position available within her lifting restriction. Yet, Southwick claims that Cindy Harris Hite, an employee with a fifteen pound lifting restriction was not forced to take leave and Linda Ledbetter was transferred from tray wash to another area to accommodate the lifting restriction she had during her pregnancy. (Docket Entry No. 46 at pp. 57-8). Both Hite and Ledbetter are white (Id. at p. 59), supporting the notion that Southwick was treated differently than non-Asian, pregnant employees. Finally, additional support for the alleged disparate treatment is the fact that Ledbetter was removed from tray wash after submitting a lifting restriction to Russell Stover, while Southwick was transferred to tray wash after submitting a lifting restriction.

The Court concludes that Plaintiff has presented triable factual issues as to whether requiring leave constituted an adverse employment action and whether Southwick was treated differently during her pregnancy than Hite and Ledbetter were treated during theirs, and Russell Stover did not present evidence that the disparate treatment was for a legitimate, non-discriminatory reasons.

## Retaliation

Under Title VII, an employer cannot retaliate against an employee who engages in any activity protected under Title VII. 42 U.S.C. § 2000e-3(a). Title VII's prohibition against

32

retaliation extends to the employee's opposition to any unlawful employment practice and the employee's participation in an investigation, proceeding or hearing under Title VII. Id. Southwick's claim is that Russell Stover retaliated against her by terminating her employment after she filed her March 19, 2004 EEOC complaint.

To establish a prima facie case of retaliation, Southwick must show: (1) that she engaged in an activity protected by Title VII; (2) that the exercise of her civil rights was known to the Russell Stover; (3) thereafter Russell Stover took an employment action adverse to Southwick; and (4) that there was a causal connection between the protected activity and the adverse employment action. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000). The first three elements of the prima facie case are undisputed. The disagreement amongst the parties is whether Southwick can establish a causal connection between the protected activity– the filing of her complaint in March 2004, and the adverse employment action– the termination of her employment on August 4, 2004.

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." Id.

"A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation... However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." Id. (citation omitted).

"[A]t the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected

33

activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." Nguyen, 229 F.3d at 566 (citing EEOC v. Avery Dennison Corp., 104 F.3d at 861). Thus, Southwick must put forth sufficient evidence to create an inference that Russell Stover terminated her employment *because* she filed a complaint in March 2004 and would not have done so otherwise.

The burden is minimal and the Court is required to make all reasonable inferences in favor of the nonmoving party. The Court finds that Plaintiff has created material factual disputes. Plaintiff's controversy with the Defendant occurred beginning in November 2003. During that time period Plaintiff had differences with the Defendant's representative about her leave and the Defendant's disparate treatment.

Thus, the Court concludes that because Plaintiff was unable to present sufficient evidence to support prima facie claims of a violation of the FMLA or the PDA. However, the Court finds that Plaintiff has established a prima facie claim of hostile work environment. Moreover, the Court finds material factual disputes exist on whether the Defendant discriminated against Plaintiff based on her national origin and whether the Defendant terminated Plaintiff's employment in retaliation for filing an EEOC charge. Thus, Defendant's motion for summary judgment (Docket Entry No. 42), should be granted in part and denied in part.

An appropriate Order is filed herewith.

**ENTERED** this the _____ day of March, 2007.

WILLIAM J. HAYNES, JR.
United States District Judge

34